**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SIMON GORDON, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>KITE PHARMA, INC., ARIE S. BELLDEGRUN, DAVID BONDERMAN, JOSHUA A. KAZAM, OWEN N. WITTE, FARAH H. CHAMPSI, IAN T. CLARK, ROY DOUMANI, FRANZ HUMER, RAN NUSSBAUM, JONATHAN PEACOCK, and STEVEN RUCHEFSKY,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(e), 14(d)(4), AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY DEMAND** |

Plaintiff Simon Gordon ("Plaintiff"), on behalf of himself and the proposed Class defined herein, brings this class action suit for violations of Sections 14(e), 14(d)(4), and 20(a) of the Securities Exchange Act of 1934. In support of this Class Action Complaint, Plaintiff, by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

## NATURE OF THE ACTION

1. Plaintiff brings this action on behalf of himself and the public stockholders of Kite Pharma, Inc. ("Kite Pharma" or the "Company") against the Company and Kite Pharma's Board of Directors (collectively, the "Board" or the "Individual Defendants," as further defined below) for violations of Sections 14(e), 14(d)(4), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), §§ 78n(d)(4), 78n(e) and 78t(a) respectively), and U.S. Securities and Exchange Commission (the "SEC") Rules 14d-9 (17 C.F.R. § 240.14d-9) and SEC Regulation G, 17 C.F.R. 244.100 in connection with the proposed merger transaction ("Proposed Transaction") between

Kite Pharma and Dodgers Merger Sub, Inc. ("Merger Sub"), a direct and wholly-owned subsidiary of Gilead Sciences, Inc. ("Parent") (collectively, "Gilead").

2. On August 28, 2017, the Company announced that it had entered into an agreement and plan of merger (the "Merger Agreement") with Gilead, by which Gilead will acquire all of the outstanding shares of Kite Pharma common stock through an all-cash tender offer at a purchase price of $180.00 per share (the "Tender Offer").

3. The Tender Offer commenced on September 5, 2017, and the Company concurrently filed a 14D-9 on Schedule 14D-9 (the "14D-9") with the SEC, recommending that the Company's stockholders tender their shares for the Tender Offer price. The Tender Offer is set to expire on October 2, 2017.

4. Plaintiff alleges that the 14D-9 is materially false and/or misleading because, *inter alia*, it fails to disclose certain material internal financial information about the Company, relied on by the Individual Defendants to recommend the Proposed Transaction and by the Company's financial advisor, Centerview Partners LLC ("Centerview"), to render an opinion that the Proposed Transaction is fair to Kite Pharma stockholders, which omissions render the 14D-9 incomplete and/or misleading.

5. In particular, the 14D-9 omits material information regarding: (i) certain of the Company's financial projections and generally accepted accounting principles ("GAAP") reconciliation of those projections; and (ii) the valuation analyses performed by Centerview in support of its fairness opinion.

6. The failure to adequately disclose such material information constitutes a violation of §§ 14(e), 14(d)(4), and 20(a) of the Exchange Act, among other reasons, because Kite Pharma

stockholders are entitled to such information in order to make a fully-informed decision regarding whether to tender their shares in connection with the Tender Offer.

7. For these reasons and as set forth in detail herein, the Individual Defendants have violated federal securities laws. Accordingly, Plaintiff seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations of these laws. Judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.

**JURISDICTION AND VENUE**

8. The claims asserted herein arise under §§ 14(e), 14(d)(4), and 20(a) of the Exchange Act, 15 U.S.C. § 78aa. The Court has subject matter jurisdiction pursuant to § 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

9. The Court has personal jurisdiction over each of the Defendants because each conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10. Venue is proper in this District under § 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as pursuant to 28 U.S.C. § 1391, because Kite Pharma is incorporated in this District.

**PARTIES**

11. Plaintiff is, and has been at all relevant times, the owner of shares of Kite Pharma common stock.

12. Defendant Kite Pharma is a Delaware corporation with its principal executive offices located at 2225 Colorado Avenue, Santa Monica, California 90404. Kite Pharma's common stock trades on the Nasdaq under the ticker symbol "KITE."

13. Individual Defendant Arie S. Belldegrun ("Belldegrun") has served as a director of the Company since 2014.

14. Individual Defendant David Bonderman ("Bonderman") has served as a director of the Company since 2011.

15. Individual Defendant Joshua A. Kazam ("Kazam") has served as a director of the Company since 2009.

16. Individual Defendant Owen N. Witte ("Witte") has served as a director of the Company since 2017.

17. Individual Defendant Farah H. Champsi ("Champsi") has served as a director of the Company since 2013.

18. Individual Defendant Ian T. Clark ("Clark") has served as a director of the Company since 2017.

19. Individual Defendant Roy Doumani ("Doumani") has served as a director of the Company since 2011.

20. Individual Defendant Franz B. Humer ("Humer") has served as a director of the Company since 2015.

21. Individual Defendant Ran Nussbaum ("Nussbaum") has served as a director of the Company since 2013.

22. Individual Defendant Jonathan M. Peacock ("Peacock") has served as a director of the Company since 2014.

23. Individual Defendant Steven B. Ruchefsky ("Ruchefsky") has served as a director of the Company since 2011.

24. Defendants Belldegrun, Bonderman, Kazam, Witte, Champsi, Clark, Doumani, Humer, Nussbaum, Peacock, and Ruchefsky are collectively referred to as "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

25. Plaintiff brings this action individually and as a class action on behalf of all holders of Kite Pharma stock who are being, and will be, harmed by Defendants' actions described herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the Individual Defendants.

26. This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

27. The Class is so numerous that joinder of all members is impracticable. According to the 14D-9, as of August 31, 2017, there were 57,410,242 shares issued and outstanding. These shares are held by thousands of beneficial holders who are geographically dispersed across the country.

28. There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, inter alia, the following:

a. whether Defendants have violated Sections 14 and 20 of the Exchange Act in connection with the Proposed Transaction and SEC regulations promulgated thereunder; and

b. whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

29. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

30. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

31. The prosecution of separate actions by individual members of the Class creates a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

32. Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

33. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class a whole.

34. Accordingly, Plaintiff seeks injunctive and other equitable relief on behalf of himself and the Class to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

## SUBSTANTIVE ALLEGATIONS

### I. Background and the Proposed Transaction

35. Kite Pharma, Inc. is a clinical-stage biopharmaceutical company. The Company is focused on the development and commercialization of cancer immunotherapy products to target

and kill cancer cells. Kite Pharma offers engineered autologous cell therapy, which is an approach to the treatment of cancer.[1]

36. On August 28, 2017, Kite Pharma and Gilead issued a joint press release announcing the Proposed Transaction which stated the following, in relevant part:

> FOSTER CITY, Calif. & SANTA MONICA, Calif. (BUSINESS WIRE) - Gilead Sciences, Inc. (Nasdaq: GILD) and Kite Pharma, Inc. (Nasdaq: KITE) announced today that the companies have entered into a definitive agreement pursuant to which Gilead will acquire Kite for $180.00 per share in cash. The transaction, which values Kite at approximately $11.9 billion, was unanimously approved by both the Gilead and Kite Boards of Directors and is anticipated to close in the fourth quarter of 2017. The transaction will provide opportunities for diversification of revenues, and is expected to be neutral to earnings by year three and accretive thereafter.
>
> Kite is an industry leader in the emerging field of cell therapy, which uses a patient's own immune cells to fight cancer. The company has developed engineered cell therapies that express either a chimeric antigen receptor (CAR) or an engineered T cell receptor (TCR), depending on the type of cancer. Kite's most advanced therapy candidate, axicabtagene ciloleucel (axi-cel), is a CAR T therapy currently under priority review by the U.S. Food and Drug Administration (FDA). It is expected to be the first to market as a treatment for refractory aggressive non-Hodgkin lymphoma, which includes diffuse large B-cell lymphoma (DLBCL), transformed follicular lymphoma (TFL) and primary mediastinal B-cell lymphoma (PMBCL). The FDA has set a target action date of November 29, 2017 under the Prescription Drug User Fee Act (PDUFA). A marketing authorization application (MAA) has also been filed for axi-cel for the treatment of relapsed/refractory DLBCL, TFL and PMBCL with the European Medicines Agency (EMA), representing the first submission in Europe for a CAR T therapy. Approval in Europe is expected in 2018. Kite has additional candidates in clinical trials in both hematologic cancers and solid tumors, including KITE-585, a CAR T therapy candidate that targets BCMA expressed in multiple myeloma.
>
> “The acquisition of Kite establishes Gilead as a leader in cellular therapy and provides a foundation from which to drive continued innovation for people with advanced cancers," said John F. Milligan, PhD, Gilead's President and Chief Executive Officer. "The field of cell therapy has advanced very quickly, to the point where the science and technology have opened a clear path toward a potential cure for patients. We are greatly impressed with the Kite team and what they have accomplished, and share their belief that cell therapy will be the

---

1 http://www.reuters.com/finance/stocks/company-profile/KITE.OQ.

> cornerstone of treating cancer. Our similar cultures and histories of driving rapid innovation in order to bring more effective and safer products to as many patients as possible make this an excellent strategic fit."
>
> Research and development as well as the commercialization operations for Kite will remain based in Santa Monica, California, with product manufacturing remaining in El Segundo, California.
>
> "From the release of our pivotal data for axi-cel, to our potential approval by the FDA, this is a year of milestones. Each and every accomplishment is a reflection of the talent that is unique to Kite. We are excited that Gilead, one of the most innovative companies in the industry, recognized this value and shares our passion for developing cutting-edge and potentially curative therapies for patients," said Arie Belldegrun, MD, FACS, Chairman, President and Chief Executive Officer of Kite. "CAR T has the potential to become one of the most powerful anti-cancer agents for hematologic cancers. With Gilead's expertise and support, we hope to fulfill that potential by rapidly accelerating our robust pipeline and next-generation research and manufacturing technologies for the benefit of patients around the world."

## II. The Tender Offer Appears Inadequate in Light of Kite Pharma's Recent Financial Performance and Growth Prospects

37. The Tender Offer appears inadequate in light of the Company's recent financial performance and prospects for future growth. Indeed, the Tender Offer represents ***less than a 1% premium*** on the Company's 52-week high of $179.68 per share. Further, Kite Pharma first reported sales in 2015 and experienced sales growth of ***28.46%*** by the end of fiscal year 2016.

38. Kite Pharma is a company on the precipice of becoming extremely profitable. The Company's CAR-T cancer treatment is on the verge of evaluation by, and potential approval from, the U.S. Food and Drug Administration ("FDA"). If the FDA approves the CAR-Treatment, Kite Pharma could reap enormous returns which would in turn benefit Kite Pharma's shareholders. By recommending that the Company's shareholders tender their shares now, for a mere $180 per share, the Defendants are preventing the Company's shareholders from recouping the potential upside of their investment.

39. In a press release issued on August 8, 2017, reporting the Company's results for the second quarter of 2017, Individual Defendant Belldegrun, Chairman, President, and Chief Executive Officer ("CEO") of Kite, commented on the Company's positive growth, stating the following, in relevant part:

> "We've continued to make significant progress on key clinical and commercial milestones in the last six months alone … With the anticipated events on the horizon for the remainder of 2017, the potential for CAR-T to become one of the most powerful anti-cancer agents for certain patients may finally be realized."

40. That same day, during an earnings call, Individual Defendant Belldegrun stated the following, in relevant part:

> "As we have delivered on each goal we set out to achieve and others in the industry are seeing success in [indiscernible] cell therapy trials, the potential of CAR-T becomes increasingly harder to deny. With the events on the horizon this year, I hope more people we see and understand the power of CAR-T, its commercial viability and ultimately, its potential to become one of the most powerful anti-cancer agents for certain patients with otherwise incurable cancer. At Kite today, we await possible approval for axi-cel in the United States. We already for commercialization in the U.S. with all teams in place. We were the first company to submit an application for marketing authorization in Europe for a CAR-T therapy which we announced last week.
>
> We're rapidly advancing preparations for commercial launch in Europe. We, together with our joint venture in China and our partner in Japan, continue to make great progress in taking the necessary steps to bring axi-cel to China and Japan. We're accelerating our next potential breakthrough candidate KITE-585, our anti-BCMA investigational cell therapy … Our clinical team continues to develop and expand potential indications of axi-cel with 5 ongoing clinical trials. We're progressing the broader KTE-C19 program for conditions such as mantle cell lymphoma, indolent NHL, ALL and CLL. In addition, we continue to forge ahead with our extensive clinical pipeline of new CAR and TCR therapies using innovative targets and incorporating next generation technologies and safety components."

41. In sum, it appears that Kite Pharma is well-positioned for financial growth, and that the Tender Offer fails to adequately compensate the Company's shareholders. It is imperative that Defendants disclose the material information they have omitted from the 14D-9, discussed in detail

below, so that the Company's shareholders can properly assess the fairness of the Tender Offer for themselves and make an informed decision concerning whether to tender their shares.

**III. The 14D-9 Omits Material Information**

42. On September 5, 2017, Kite Pharma filed the 14D-9 with the SEC in support of the Tender Offer. As alleged below and elsewhere herein, the 14D-9 contains material misrepresentations and omissions of fact that must be cured to allow Kite Pharma's stockholders to make an informed decision with respect to the Tender Offer. Specifically, the 14D-9 omits material information regarding: (i) certain of the Company's financial projections and generally accepted accounting principles ("GAAP") reconciliation of those projections; and (ii) the valuation analyses performed by the Company's financial advisor, Centerview, in support of its fairness opinion.

***The Company's Financial Forecasts***

43. First, the 14D-9 discloses the value of non-GAAP metric EBIT and defines EBIT as estimated earnings before interest and taxes, but fails to: (i) provide the value of the underlying line items interest and taxes; and (ii) reconcile EBIT to its most comparable GAAP equivalent. 14D-9, 29.

44. Second, the 14D-9 discloses the value of Kite Pharma's unlevered free cash flows ("UFCF") and defines the non-GAAP metric as earnings before interest, taxes, depreciation and amortization, less capital expenditures, less changes in net working capital and less tax expense, but fails to provide the value of the underlying line items (i) interest, (ii) taxes, (iii) depreciation and amortization, (iv) capital expenditures, (v) net working capital and (vi) tax expense. The 14D-9 also fails to reconcile UFCF to its most comparable GAAP equivalent. 14D-9, 29.

45. When a company discloses non-GAAP financial measures in a 14D-9, the Company must also disclose all projections and information necessary to make the non-GAAP

measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method), of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

46. The SEC increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders. The former SEC Chairwoman, Mary Jo White, stated that the frequent use by publicly traded companies of unique, company-specific non-GAAP financial measures (as Kite has included in the 14D-9 here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[2]

47. The SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[3]

---

[2] Mary Jo White, Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

[3] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-

Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[4] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts. The SEC has consistently required companies to reconcile non-GAAP financial measures with their respective GAAP equivalents in the context of merger and tender offer transactions.

48. Indeed, Defendants acknowledge the materially incomplete and misleading nature the non-GAAP measures included in the 14D-9, stating that: "The Company's management believes [non-GAAP] measures are helpful in understanding forecasts of the Company's future results. Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in accordance with GAAP. The calculations of non-GAAP financial measures reflected in the Forecasts may differ from others in the Company's industry and are not necessarily comparable with similar titles used by other companies." 14D-9, 30.

***Centerview's Valuation Analyses and Fairness Opinion***

49. With respect to Centerview's *Discounted Cash Flow Analysis* ("DCF"), the 14D-9 discloses that Centerview made adjustments to the Company's UFCF for the following line items, among other things: estimated capital expenditures, depreciation and amortization, and changes in net working capital. 14D-9, 35. As detailed above, the aforementioned line items were used, in

---

secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

4 *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2016), https://www.sec.gov/divisions /corpfin/guidance/ nongaapinterp.htm.

part, to calculate Kite Pharma's UFCF, however the 14D-9 fails to disclose the value of those line items and fails to disclose what adjustments were made thereto by Centerview. Further, the 14D-9 fails to provide Centerview's rationale for adjusting the aforementioned line items.

50. Additionally, the 14D-9 states that Centerview assumed Kite Pharma's UFCF would decline in perpetuity after December 31, 2032 at a rate of free cash flow decline of 50.0% year-over-year in conducting its DCF Analysis. 14D-9, 35. However, the 14D-9 fails to provide the rationale underlying Centerview's assumption regarding the future decline of the Company's cash flows. Absent further disclosure by the Company, Kite Pharma's shareholders are being materially misled about the Company's future prospects.

51. These key inputs are material to Kite Pharma shareholders, and their omission renders the summaries of Centerview's DCF valuation analysis incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. . . . The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

52. Clearly, shareholders would find the aforementioned information material since the Board's unanimous recommendation that shareholders tender their shares in connection with the Proposed Transaction was based in part on the following:

- The [Board] considered the current and historical financial condition, results of operations, business, competitive position, properties, assets and prospects of the Company, the execution risks associated with obtaining U.S. and non-U.S. regulatory approvals for product candidates in the Company's pipeline as well as the risks associated with transitioning from a clinical-stage company to a commercial-stage company, in connection with the expected commercialization of axi-cel and other product candidates in the Company's product portfolio.

14D-9, 22.

53. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Kite Pharma's stockholders. Accordingly, based on the foregoing disclosure deficiencies in the 14D-9, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Kite Pharma stockholders will suffer, absent judicial intervention, if Kite Pharma's stockholders are required to decide whether or not to tender their shares without the above-referenced material misstatements and omissions being remedied.

## CLAIMS FOR RELIEF

### COUNT I
**Claims Against All Defendants for Violations of § 14(e) of the Securities Exchange Act of 1934**

54. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

55. Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . ." 15 U.S.C. § 78n(e).

56. As discussed above, Kite Pharma filed and delivered the 14D-9 to its stockholders, which Defendants knew, or recklessly disregarded, contained material omissions and misstatements described herein.

57. Defendants violated §14(e) of the Exchange Act by issuing the 14D-9 in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the tender offer commenced in conjunction with the Proposed Transaction. Defendants knew or recklessly disregarded that the 14D-9 failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

58. The 14D-9 was prepared, reviewed and/or disseminated by Defendants. It misrepresented and/or omitted material facts, including material information about the consideration offered to stockholders via the tender offer, the intrinsic value of the Company, the Company's financial projections, and Centerview's valuation analyses and resultant fairness opinion.

59. In so doing, Defendants made untrue statements of material fact and omitted material information necessary to make the statements that were made not misleading in violation of § 14(e) of the Exchange Act. By virtue of their positions within the Company and/or roles in the process and in the preparation of the 14D-9, Defendants were aware of this information and their obligation to disclose this information in the 14D-9.

60. The omissions and misleading statements in the 14D-9 are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares or seek appraisal. In addition, a reasonable investor would view the information identified above which has been omitted from the 14D-9 as altering the "total mix" of information made available to stockholders.

61. Defendants knowingly, or with deliberate recklessness, omitted the material information identified above from the 14D-9, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the 14D-9, rendering certain portions of the 14D-9 materially incomplete and therefore misleading.

62. The misrepresentations and omissions in the 14D-9 are material to Plaintiff, and Plaintiff will be deprived of his entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

**COUNT II**
**Claims Against All Defendants for Violations of § 14(d)(4) of the Securities Exchange Act of 1934 and SEC Rule 14d-9 (17 C.F.R. § 240.14d-9)**

63. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

64. Defendants have caused the 14D-9 to be issued with the intention of soliciting stockholder support of the Proposed Transaction.

65. Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.

66. The 14D-9 violates § 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which render the 14D-9 false and/or misleading.

67. Defendants knowingly, or with deliberate recklessness, omitted the material information identified above from the 14D-9, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction,

they allowed it to be omitted from the 14D-9, rendering certain portions of the 14D-9 materially incomplete and therefore misleading.

68. The misrepresentations and omissions in the 14D-9 are material to Plaintiff, and Plaintiff and Kite Pharma stockholders will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

69. The misrepresentations and omissions in the 14D-9 are material to Plaintiff, and Plaintiff and Kite Pharma stockholders will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

**COUNT III**
**Against the Individual Defendants for Violations of § 20(a) of the 1934 Act**

70. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

71. The Individual Defendants acted as controlling persons of Kite Pharma within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of Kite Pharma and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the 14D-9, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

72. Each of the Individual Defendants was provided with or had unlimited access to copies of the 14D-9 alleged by Plaintiff to be misleading prior to and/or shortly after these

statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

73. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The 14D-9 contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of the 14D-9.

74. By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the 1934 Act.

75. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(d) of the 1934 Act and Rule 14d-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of Defendants' conduct, Plaintiff is threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B. Enjoining Defendants and all persons acting in concert with them from proceeding with the Tender Offer or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above, which has been omitted from the 14D-9;

C. Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D. In the event Defendants consummate the Proposed Transaction, awarding damages to Plaintiff and the Class;

E. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: September 7, 2017

**FARUQI & FARUQI, LLP**

By: */s/ Michael VanGorder*
Michael Van Gorder (#6214)
20 Montchanin Road, Suite 145
Wilmington, DE 19807
Tel.: (302) 482-3182
Email: mvangorder@faruqilaw.com

*Counsel for Plaintiff*

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
James M. Wilson, Jr. (*Pro Hac forthcoming*)
685 Third Ave., 26th Fl.
New York, NY 10017
Tel.: (212) 983-9330
Email: nfaruqi@faruqilaw.com
Email: jwilson@faruqilaw.com

*Counsel for Plaintiff*